# United States Court of Appeals

## For the First Circuit

No. 08-1818

EFRAÍN GONZÁLEZ-FUENTES, et al.,

Petitioners, Appellees,

v.

HON. CARLOS MOLINA, Secretary of Corrections and
Rehabilitation of of Puerto Rico and Administrator of
Corrections of the Commonwealth of Puerto Rico,

Respondent, Appellant.

No. 08-1819

CARMEN RIVERA-FELICIANO, et al.

Plaintiffs, Appellees,

v.

HON. LUIS FORTUNO BURSET, Governor of Puerto Rico;
HON. ROBERTO SANCHEZ-RAMOS, Secretary of Justice of the
Commonwealth of Puerto Rico; HON. CARLOS MOLINA, Secretary
of Corrections and Rehabilitation of Puerto Rico and
Administrator of Corrections of the Commonwealth of Puerto Rico;
HON. JOSE R. LOZADA, Director of the Bureau of Special
Investigations of the Commonwealth of Puerto Rico,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Howard, Selya and Ebel[*],
<u>Circuit Judges</u>.

---

<u>Susana I. Peñagarícano-Brown</u>, Puerto Rico Department of
Justice, with whom <u>Roberto J. Sanchez Ramos</u>, Secretary of Justice
and <u>Ileana M. Oliver-Falero</u>, Acting Solicitor General, were on
brief, for appellants.
    <u>Guillermo Ramos Luiña</u>, with whom <u>Carlos V. García Gutiérrez</u>,
<u>Alejandra Bird Lopez</u> and <u>Rafael E. Rodríguez Rivera</u>, were on
brief, for appellees.

---

June 10, 2010

---

[*]Of the Tenth Circuit, sitting by designation.

**HOWARD**, <u>**Circuit Judge**</u>.  In 2005, the Commonwealth of Puerto Rico determined that a number of individuals in its prison system had been unlawfully admitted into an electronic supervision program.  Seeking to rectify the situation, Puerto Rico attempted to reincarcerate them.  After one set of fourteen individuals had been reimprisoned, another set successfully brought a civil rights suit under 42 U.S.C. § 1983 in federal district court to enjoin Puerto Rico from taking any action against them.  Their reimprisoned counterparts then filed a federal habeas petition on identical grounds, which the district court similarly granted.  Puerto Rico appealed both the grant of the preliminary injunction and the grant of habeas relief, and we consolidated the two appeals.[1]

The questions presented are the same in each case: whether Puerto Rico's revocation of these individuals' participation in the electronic supervision program violated the Ex Post Facto Clause or the Due Process Clause of the Fourteenth Amendment.

---

[1] The appellants are, or were, executive officials within the Puerto Rico government.  For the sake of simplicity, we refer to them collectively as "Puerto Rico" or "the Commonwealth."  We do not at this time take up the case-captioning matter of whether any of the successors in office to any of these parties should be substituted for the named defendants/respondents.

In 1989, faced with overcrowding within its prison system, the Puerto Rico Administration of Corrections ("AOC") issued a memorandum proposing procedures for an Electronic Supervision Program ("ESP"). The ESP would permit eligible inmates to wear electronic tracking anklets and complete the remainder of their sentences outside of prison. Acting under the authority conferred in its enabling act, see P.R. Laws Ann. tit. 4, § 1101 et seq., the AOC formalized the electronic supervision program in 1994 when it adopted Regulation No. 5065 ("the 1994 regulation"). The program's eligibility criteria provided that convictions for certain designated offenses would bar an inmate from participating in the ESP. Because murder was not included in the list of ineligible offenses, murder convicts were initially permitted to join the program.

That changed on May 26, 1995 with the Puerto Rico legislature's passage of Public Law 49 ("Law 49"), which amended the AOC's enabling act to preclude murder convicts from ever participating in transition or treatment and rehabilitation programs. P.R. Laws Ann. tit. 4, § 1136a. The AOC originally interpreted Law 49 to apply retroactively, blocking admission to the ESP for all individuals convicted of murder.[2] But a number of

---

[2]Law 49 did contain a grandfather clause that preserved the eligibility of all those already participating in the program as of the date of the law's passage. That clause did not, however,

inmates who had been convicted of murders committed before Law 49's effective date separately filed suits in state courts challenging the application of the law to them.[3] These courts determined that retroactive application would violate the Ex Post Facto Clause of the U.S. Constitution. The AOC did not appeal these rulings. Rather, in August 1996, it issued an internal agency memorandum instructing corrections personnel not to apply Law 49 to any inmate sentenced before the law's effective date. Under this new policy, a number of murder convicts who had committed their crimes prior to May 26, 1995, were admitted into the ESP.

In 1999, the AOC promulgated Regulation No. 6041 ("the 1999 regulation"). The 1999 regulation provided, among other things, that inmates must be within three years of release under their minimum sentence before they could become eligible for the ESP ("the three-years provision"). In addition, the regulation restated Law 49's prohibition on murder convicts participating in the ESP. Consistent with its position that Law 49 was non-

---

extend to those who were not participating in the program prior to that date. Because each of the appellees in this case committed the crime of murder before the effective date of Law 49 and began participation in the ESP after the effective date of Law 49, the grandfather clause is irrelevant to them.

[3]Puerto Rico is the functional equivalent of a state for all purposes relevant to this case. Thus, as we have done elsewhere, we will sometimes refer to "state courts" or issues of "state law," notwithstanding Puerto Rico's unique commonwealth status. See, e.g., R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 183 n.2 (1st Cir. 2006).

retroactive, the AOC did not apply this section of the 1999 regulation to those who had been convicted before Law 49's effective date. It remains unclear whether the other sections of the 1999 regulation, such as the three-years provision, were also meant to be non-retroactive. Over the next few years, there was much confusion about and litigation over which regulation applied to whom and just how widely Law 49 should apply.

Meanwhile, independent of the wrangling over the scope of Law 49, the Commonwealth had begun to investigate allegations that certain inmates had acquired ESP privileges through bribery. It did not uncover any evidence supporting those allegations. Nevertheless, in the course of the investigations, it concluded that fourteen[4] participants in the ESP did not actually qualify for the program. Although the participants all happened to have been convicted of murder, that fact was entirely incidental to the Commonwealth's initial conclusion that they were ineligible. Instead, it reasoned that these participants did not meet the 1999 regulation's three-years provision, apparently without considering whether that provision applied to them in the first place. On April 6-7, 2005, these participants were arrested and reincarcerated without being told the justification. Following a pro forma administrative hearing in which they were unable to

---

[4]Because two of these petitioners have since passed away, only twelve of the original fourteen remain.

present any evidence on their own behalf, they petitioned for a writ of habeas corpus in the Court of First Instance of Puerto Rico, seeking release back into the ESP. These reimprisoned individuals, who would come to be known as the González-Fuentes petitioners, alleged violations of the Ex Post Facto Clause and of their right to due process. At this point, Puerto Rico abandoned its reliance on the three-years provision and -- for the first time -- advanced the petitioners' status as murder convicts as a basis for reimprisonment.

The then-current administration, recently installed following the gubernatorial elections, had now resolved that the Ex Post Facto Clause would not actually prevent the retroactive application of Law 49 to ESP participants who had been convicted before May 26, 1995. In its view, both the executive officials who had first litigated the issue and the lower courts which had adjudicated it had misinterpreted ex post facto doctrine. The battleground for this new position was the González-Fuentes petitioners' habeas proceedings. Though the Court of First Instance sided with the petitioners and granted them habeas corpus relief, the Puerto Rico Court of Appeals disagreed, revoking the writ. The petitioners then appealed to the Puerto Rico Supreme Court.

On August 26, 2005, before the Puerto Rico Supreme Court had ruled on the matter, Puerto Rico's Secretary of Justice

announced the government's intention to reimprison all participants in the ESP who had been convicted of murder. It based its decision not on infractions of program rules, but rather on the new administration's conclusion that these program participants were all ineligible for the ESP under Law 49. That same day, a number of murder convicts participating in the ESP filed a complaint in federal district court under 42 U.S.C. § 1983 seeking a preliminary injunction to halt the revocation of ESP privileges. These participants, who came to be known as the Rivera-Feliciano plaintiffs, echoed the González-Fuentes petitioners' arguments that reimprisonment would violate the Ex Post Facto and Due Process Clauses.

The fates of these two sets of participants would soon become intertwined.[5] In September 2005, the district court granted the Rivera-Feliciano plaintiffs' request for a preliminary injunction. After the Commonwealth appealed that decision to this court, we elected to stay all proceedings in the case pending the Puerto Rico Supreme Court's resolution of the González-Fuentes petitioners' habeas petition. See Rivera-Feliciano v. Acevedo-Vila, 438 F.3d 50, 60–62 (1st Cir. 2006).

In March 2006, the Puerto Rico Supreme Court denied the petition. It concluded that the nullification of ESP privileges

---

[5]We subsequently refer to both sets collectively as "the appellees" except where the distinction between them is relevant to the discussion.

posed no ex post facto problem because the petitioners committed their respective crimes before the program had even been created. The court also ruled that the nullification did not offend due process because the petitioners did not possess a protected liberty interest in remaining in the program. It reasoned that the plain terms of Law 49 had rendered the petitioners ineligible for the program, such that their admission into it was nothing more than "administrative error." According to the court, the petitioners could not develop a protected interest in retaining a mistaken grant of liberty.

Following their loss in the Puerto Rico courts, the petitioners filed a subsequent habeas corpus petition in federal district court under 28 U.S.C. §§ 2241 and 2254. Again they alleged violations of the Ex Post Facto and Due Process Clauses. The district court then consolidated the González-Fuentes habeas case with the Rivera-Feliciano § 1983 case.

The Commonwealth filed a motion to dismiss the Rivera-Feliciano claims, which the district court denied. Unfazed, the Commonwealth then moved to dissolve the preliminary injunction in that case. The district court again denied the motion, stating in its order that the new motion was merely "rehashing the arguments presented in [the Commonwealth's] previous requests to dismiss and already addressed by this Court." After this second denial, the Commonwealth filed an interlocutory appeal.

Shortly after this episode, the district court granted habeas relief to the González-Fuentes petitioners, concluding that the Puerto Rico Supreme Court's decision was in multiple respects contrary to, and an unreasonable application of, clearly established federal law. The district court first held that the Puerto Rico Supreme Court's interpretation of the Ex Post Facto Clause was contrary to the United States Supreme Court's decision in Lynce v. Mathis, 519 U.S. 433 (1997), a case concerning the revocation of early release credits. It then rejected the Puerto Rico Supreme Court's handling of the petitioners' due process claim, finding that their liberty interest in remaining in the ESP was analogous to a parolee's liberty interest in remaining on parole. The Commonwealth appealed this decision as well, which now comes before us alongside the Rivera-Feliciano appeal.

## II.

### A.

The two most commonly trodden paths under federal law for redress of complaints related to state imprisonment are through the filing of a petition for habeas corpus or a civil-rights complaint under 42 U.S.C. § 1983. Despite the overlap in subject matter, the two schemes are not interchangeable. The Supreme Court has explained that it would "wholly frustrate explicit congressional intent" to allow plaintiffs to circumvent the federal habeas statute's narrow prerequisites simply by invoking § 1983. Preiser

v. Rodriquez, 411 U.S. 475, 489-90 (1973).  The Court has therefore held that "a prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his confinement.  He must seek federal habeas corpus relief (or appropriate state relief) instead."  Wilkinson v. Dotson, 544 U.S. 74, 78 (2004) (internal quotation marks and citations omitted).

With one set of appellees here relying on the federal habeas statute and another set relying on § 1983, there is some question at the outset whether both groups should have proceeded exclusively under one scheme or the other.[6]  The dispute before us is an example of "[t]he difficult intermediate case" where an inmate is seeking neither a change in conditions nor an earlier release, but rather a less restrictive form of custody.  Graham v. Broglin, 922 F.2d 379, 381 (7th Cir. 1991).

In Graham, the Seventh Circuit adopted the following approach:

> If the prisoner is seeking what can be fairly described as a quantum change in the level of custody -- whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation . . . then habeas corpus is his remedy.  But if he is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will

[6]In our previous foray into this litigation, we noted the difference but declined to address the issue further.  See Rivera-Feliciano, 438 F.3d at 55 n.5.

-11-

> usually be the case, the program or location
> or environment that he is challenging is more
> restrictive than the alternative that he
> seeks.

Id.; see also Dotson, 544 U.S. at 85 (Scalia, J., concurring)

(approving of "quantum change" framework); Plyler v. Moore, 129

F.3d 728, 733 (4th Cir. 1997) (same); In re Deutsch, No. 94-5310,

1995 WL 66633, at *1 (D.C. Cir. Feb 14, 1995) (per curiam) (same).[7]

We think that the difference between the ESP here and

incarceration in a prison can fairly be described as a quantum

change in the level of custody. As we describe below in our

discussion of procedural due process, participants in the ESP were

able to live with family members, work daily jobs, attend church,

and reside in their own homes rather than in an institutional

---

[7]In a recent unpublished decision, a panel of the Tenth Circuit questioned whether Graham's "quantum of custody" inquiry had survived the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995), which held that the difference between the general prison population and segregated confinement was insufficient to give rise to a liberty interest protected by due process. See Gee v. Murphy, 325 F. App'x 666, 670 (10th Cir. 2009). In our view, however, the more likely effect that Sandin has on Graham is simply to direct courts how to apply it. When an inmate seeks a change from segregation into the general prison population, that claim must proceed under § 1983 because, under Sandin, the quantum change in custody is insufficient. But where the quantum change in custody is still great enough, habeas remains the appropriate vehicle. See Sylvester v. Hanks, 140 F.3d 713, 714 (7th Cir. 1998) (observing that although Sandin might preclude habeas actions that challenge removal from the general prison population into segregation, "dramatically more restrictive confinement may be contested in a collateral attack under § 2254"). Here, as we elaborate on below in our discussion of procedural due process, we think that the difference in the level of custody between the ESP and imprisonment was of sufficient magnitude to justify the use of habeas corpus.

setting.  See Graham, 922 F.2d at 381 ("[H]ome is a less restrictive place in which to serve one's sentence as well as a different one.").  The González-Fuentes petitioners' action was thus correctly considered in habeas corpus.

The Rivera-Feliciano plaintiffs, meanwhile, filed their claim in an attempt to preserve the status quo.  Their level of custody had yet to be increased, and they were trying to keep it that way.  Thus, because custodial status would be determined as of the date a habeas petition is filed, Carafas v. LaVallee, 391 U.S. 234, 238-40 (1968), habeas would have not yet been available to them for this purpose,  and their claim was correctly styled as a § 1983 action.[8]

_____

[8]We recognize that a future restraint on liberty may provide a basis for habeas jurisdiction if it is imminent and inevitable. See, e.g., Hensley v. Mun. Court, 411 U.S. 345, 351-52 (1973); Fernos-Lopez v. Figarella Lopez, 929 F.2d 20, 24 (1st Cir. 1991) (per curiam); Roba v. United States, 604 F.2d 215, 219 (2d Cir. 1979).  But custody is not considered imminent and inevitable for habeas purposes if it would depend on "contingencies" which may "render the entire controversy academic." Fernoz-Lopez, 929 F.2d at 24 (citing Hensley, 411 U.S. at 352).  In Hensley, the Supreme Court found that custody postponed by means of a judicial stay was sufficiently inevitable because it had been ordered by a court of law.  The Court noted that even if it were it to conclude that the petitioner was not in custody, "that result would do no more than postpone this habeas corpus action until petitioner had begun service of his sentence." 411 U.S. at 352. In Fernos-Lopez, we emphasized that the inevitability in Hensley was in large part a function of the original court order.  Fernos-Lopez, 929 F.2d at 24.  By contrast, a party's "insistence on continuing to prosecute [a] matter," even if likely to occur, was still considered a contingency that rendered custody too speculative to justify the use of habeas corpus.  Id.
Here, the record does not indicate that any formal proceedings to reincarcerate the Rivera-Feliciano plaintiffs have ever been

-13-

In sum, the two actions were styled properly.  We may take them as we find them.

B.

While our exercise of appellate jurisdiction is not at issue in the González-Fuentes action, the Rivera-Feliciano plaintiffs contest it with respect to the district court's preliminary injunction.  Since Puerto Rico's motion to dissolve the injunction was, according to the district court, a mere restatement of arguments that the court had already rejected when it denied Puerto Rico's motion to dismiss, the Rivera-Feliciano plaintiffs claim that the timeliness of the appeal should be measured from the earlier of the court's two denials.  Therefore, the argument goes,

---

initiated.  The only guarantee is the Secretary of Justice's public proclamation.  Without a doubt, the odds are great that the Commonwealth will follow through on that proclamation if it is allowed to do so, but that outcome is not a legal certainty.  It remains, rather, a matter of executive discretion.  We do not consider the exercise of that discretion to be sufficiently inevitable to justify the use of habeas corpus.  See id.; cf. Edmunds v. Won Bae Chang, 509 F.2d 39, 41 (9th Cir. 1975) (finding that the threat of confinement from an upcoming contempt proceeding was not sufficiently inevitable to fulfill habeas's custody requirement because "[n]o sentence of confinement presently exists, and none may be forthcoming").  The plaintiffs here are not attempting to secure a decreased level of custody so much as ward off a substantial threat of an increased level of custody.  Under such circumstances, plaintiffs seeking prospective relief may proceed by way of injunction.  See Dotson, 544 U.S. at 81 (explaining that a "prisoner's claim for an injunction barring future unconstitutional procedures did not fall within habeas' exclusive domain.") (emphasis in original); Matos ex rel. Matos v. Clinton School Dist., 367 F.3d 68, 73 (1st Cir. 2004) (noting that a preliminary injunction should be used "to prevent a real threat of harm").

the clock had already expired by the time Puerto Rico filed its notice of appeal from the denial of the motion to dissolve, and we cannot hear the claim.

This is a nonstarter. The Commonwealth's motion to dismiss was premised on the argument that the Rivera-Feliciano plaintiffs should have proceeded under the habeas statute rather than § 1983. When the district court determined that § 1983 was indeed an appropriate vehicle, Puerto Rico filed a motion to dissolve the injunction, which the court denied. A district court's denial of a motion to dissolve an injunctive order, unlike a denial of a typical motion to dismiss, is immediately appealable on interlocutory review. See 28 U.S.C. § 1292(a)(1) (granting appellate jurisdiction over interlocutory orders "refusing to dissolve or modify injunctions"). The only question relevant to our exercise of appellate jurisdiction is whether Puerto Rico filed a timely appeal from an appealable order. Because Puerto Rico did so, we have jurisdiction to review the order.

C.

Procedural matters now behind us, we set forth the governing standards of review. Though both groups of appellees prevailed in the district court on essentially the same claims, our standard of review differs for each set of claims because the two sets arrive here in distinct procedural postures.

As to the Rivera-Feliciano plaintiffs, Puerto Rico appeals from the district court's grant of a preliminary injunction, which we review with reference to the same four-factor test that the district court employs when deciding whether injunctive relief is appropriate in the first instance. These factors include: (1) the likelihood that the party requesting the injunction will succeed on the merits of its claim or claims; (2) the potential for irreparable harm to this party if the injunction is denied; (3) the balance of the relative hardships that will ensue following either a grant or denial; and (4) the effect (if any) that the grant or denial will have on the public interest. See R.I. Dep't of Envtl. Mgmt. v. United States, 304 F.3d 31, 45 (1st Cir. 2002). Although we generally review the grant or denial of a preliminary injunction for an abuse of discretion, this deferential standard "applies only to issues of judgment and balancing of conflicting factors, and we still review rulings on abstract legal issues de novo." Id. (internal quotation marks omitted). A material error of law constitutes an abuse of discretion. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).

As to the González-Fuentes petitioners, Puerto Rico appeals from the district court's grant of habeas corpus relief, which we review de novo. O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009). Federal habeas review of a state court's decision

is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214.[9]  Under AEDPA, once a state court has adjudicated a claim on the merits, a federal court may grant a habeas petition only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Only the first prong of this standard applies here.  A state court decision is "contrary to" clearly established Supreme Court law if it "contradicts the governing law set forth in the

---

[9]Although the González-Fuentes petitioners filed under § 2241 as well, § 2254 ultimately governs the relief that they seek. Section 2241, which does not contain many of the hurdles that § 2254 places before habeas petitioners, may be used to attack the manner in which a sentence is executed, as opposed to the sentence itself.  Muniz v. Sabol, 517 F.3d 29, 33-34 (1st Cir. 2008).  Yet even if the substance of the challenge here could theoretically support jurisdiction under § 2241, the majority view is that prisoners in state custody are required to comply with all the requirements laid out in § 2254 whenever they wish to challenge their custodial status, no matter what statutory label the prisoner uses.  To do otherwise would thwart Congress's intent in passing AEDPA.  See White v. Lambert, 370 F.3d 1002, 1006-10 (9th Cir. 2004) (discussing majority position).  But see Montez v. McKinna, 208 F.3d 862, 865 (10th Cir. 2000) (stating the minority view that state prisoners need not comply with § 2254 when attacking the execution of a sentence).  We previously adopted the majority position in an unpublished disposition, see Brennan v. Wall, 100 F. App'x 4, 4-5 (1st Cir. 2004) (per curiam), and we see no reason to abandon it here.

Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent." John v. Russo, 561 F.3d 88, 96 (1st Cir. 2009) (internal quotations marks and brackets omitted). A state court decision is an "unreasonable application" of clearly established federal law if it either "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case or unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. (internal quotation marks and brackets omitted). When determining whether federal law has been clearly established, we look to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

Normally, an analysis involving these different standards of review would require different objects of review: the federal district court's decision in the § 1983 case on the one hand and the Puerto Rico Supreme Court's decision in the habeas case on the other. Nevertheless, if we reject a particular § 1983 claim on the merits, it would necessarily mean that the Puerto Rico Supreme Court's decision, for AEDPA purposes, is to that extent not an

unreasonable application of clearly established federal law; a separate habeas analysis of that same claim would thus be superfluous. For purposes of explication, then, our discussion in the sections that follow centers on the federal district court's analysis and applies equally to the resolution of both the § 1983 and habeas claims, except where noted.

D.

Turning to the merits, Puerto Rico argues that the district court erred in concluding that the decision to revoke the appellees' participation in the ESP violated the Ex Post Facto Clause, U.S. Const. art. I, § 10, which provides that "[no] State shall . . . pass any . . . ex post facto Law." This provision "forbids not only legislative creation of new criminal liability after the event but also a legislative increase in punishment after the event." United States v. Lata, 415 F.3d 107, 110 (1st Cir. 2005). Its foundation, in the words of Justice Stone, is

> the notion that laws, whatever their form, which purport to make innocent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused.

Beazell v. Ohio, 269 U.S. 167, 170 (1925).

The district court found that Puerto Rico's actions violated the Ex Post Facto Clause as interpreted by the Supreme

-19-

Court in Lynce v. Mathis, 519 U.S. 433 (1997). In Lynce, a state statute in effect at the time of the petitioner's conviction provided that if a prison population reached approximately 98% of its capacity, "gain-time" credits that triggered early release could be acquired at an accelerated pace. After accumulating enough of these accelerated credits, the petitioner received an early release from prison. Shortly after his release, however, the law was changed so that he was no longer eligible. His accelerated credits were voided, and he was subsequently rearrested and reimprisoned to serve the balance of his sentence. Id. at 438-39.

The Court held that the retroactive application of the new law violated the Ex Post Facto Clause because the law increased the punishment for the petitioner's crime. Observing that the statute rendered "ineligible for early release a class of prisoners who were previously eligible," id. at 447 (emphasis added), the Court found that the law effectively prolonged the period of imprisonment for eligible inmates like the petitioner. Id. at 449.

Despite factual similarities, we think that Lynce is inapposite to the case before us. "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver v. Graham, 450 U.S. 24, 30 (1981). To that end, the Clause "forbids the imposition of

-20-

punishment more severe than the punishment assigned by law <u>when the</u> <u>act to be punished occurred</u>." <u>Id.</u> at 30 (emphasis added). The timing of the increase in punishment distinguishes <u>Lynce</u> from Puerto Rico's actions here. In <u>Lynce</u>, the gain-time statute under which the petitioner remained eligible was already in effect at the time the petitioner committed his crime. In other words, the crime was punishable ab initio by a period of imprisonment that was subject to reduction. When the state then retroactively eliminated credits earned under the gain-time statute, it effectively imposed a period of imprisonment that was <u>not</u> subject to reduction. <u>See</u> <u>Lynce</u>, 519 U.S. at 445 (observing that the gain-time scheme was "one determinant of petitioner's prison term and the petitioner's effective sentence is altered once this determinant is changed" (internal brackets and ellipses omitted)). The state's action thus rendered a punishment that was more severe than the punishment assigned by law when the act to be punished occurred.

Here, by contrast, the appellees committed their crimes at various points that predated the very creation of the ESP, much less the ESP's extension to those convicted of murder.[10] As a

---

[10]Nearly all of the inmates committed their crimes before the ESP's informal inception in 1989. One, however, committed his crime after this date but before the program's official establishment in 1994. The Puerto Rico Supreme Court found that because the Commonwealth's Administrative Procedure Act required notice-and-comment procedures in order for an agency's action to have any legal force, the AOC's action in 1989 was "not a 'legislative' act capable of activating the protection against <u>ex</u> <u>post facto</u> laws." <u>González-Fuentes</u> v. <u>Puerto Rico</u>, No. AC-2005-48,

result, Puerto Rico's decision to disqualify the inmates from participating in the ESP had no effect on the punishment assigned by law when the act to be punished occurred. Then, as now, the crimes were punishable only by a period of imprisonment -- not by a period of imprisonment subject to reduction through the ESP. That the appellees were participating in the ESP in the interim between the 1994 regulation and the passage of Law 49 is thus irrelevant.[11] See Stiver v. Meko, 130 F.3d 574, 578 (3d Cir. 1997) (finding that because a sentence reduction was granted pursuant to an enabling statute passed after the petitioner committed his offense, he suffered no disadvantage when the Bureau of Prisons subsequently promulgated a regulation revoking the reduction). "There can be no violation of the ex post facto clause" where "the legal consequences of [one's] crime . . . were the same when [one] committed it as they are today." Id.[12]

---

slip op. at 18 (P.R. Mar. 29, 2006). Because the parties have made no argument on appeal for treating an offense committed between 1989 and 1994 differently than an offense committed before 1989, we do not address the issue.

[11]Puerto Rico's actions could arguably present an ex post facto issue for inmates who committed murder in the year-long period between the effective dates of the 1994 regulation and Law 49. We need not decide the issue here, however, as all of the inmates in these appeals committed their crimes prior to the enactment of the 1994 regulation.

[12]The appellees' reliance on Weaver v. Graham is similarly misplaced. The petitioner in Weaver committed his offense at a time when a statute already in force provided a formula for receiving gain-time credits that would reduce the time of imprisonment. Years later, the state passed a statute that created a new, less generous formula for receiving gain-time credits.

-22-

The appellees artfully attempt to argue around this distinction. They observe that at the time of their crimes, the AOC had the discretion under its enabling act to create some community-based supervision program and extend it to murder convicts, whether or not the AOC had yet established the ESP specifically. See P.R. Laws Ann. tit. 4, § 1112(b)(3) & (c) (authorizing the AOC to "[u]se the method of rehabilitation in the community to the greatest possible extent" and to "draft . . . the internal regulations needed for the . . . rehabilitation programs of the inmates of the correctional population"). The appellees contend that Law 49 violated the Ex Post Facto Clause inasmuch as it retroactively prohibited the AOC from exercising this discretion. The absence of discretion, according to them, renders the punishment that they now face more onerous than the punishment assigned by law at the time of their offense: whereas they were originally sentenced under a regime in which the AOC had the authority to eventually grant them a supervised release of some sort, they are now being punished under a regime in which no such authority exists.

---

Going forward, the state applied this new statute and formula to all inmates -- including those who, like the petitioner, had previously been subject to the more favorable formula. The Court held that the new statute violated the Ex Post Facto Clause with respect to the petitioner because, like the statute in Lynce but unlike the one here, it was more onerous than the statute that applied at the time of the offense. 450 U.S. at 35-36.

-23-

The district court adopted this theory, analogizing the case to Lynce, where "the fact that [the petitioner] was not necessarily entitled to the credits when he pleaded guilty made no difference to the U.S. Supreme Court." Feliciano v. Acevedo-Vila, No. 05-1910, slip op. at 30 (D.P.R. Jul 8, 2008). What made a difference, rather, was the mere eligibility for early release, and according to the district court, "[t]he elimination of that eligibility -- notwithstanding that it came with no guarantee -- was sufficient to offend ex post facto principles." Id.

We do not find the analogy persuasive. The appellees' argument would have us relate retroactive measures not only to the penal schemes that existed at the time of the offense, but also to the entire universe of penal schemes that could legally be crafted at some future point, given the law in force at the time of the offense. Such an expansive reading would severely hamper the AOC's ability to experiment with alternative sentencing for its existing prison population. For any new rehabilitative program it might envision, the AOC would face a Hobson's choice of either extending it to those convicted of murder prior to Law 49's effective date or else forgoing the program entirely. An inability to tailor the sentence to the class of offender would thus become the price of developing alternatives to incarceration.

That is a price that the Ex Post Facto Clause should not and does not exact on our prison system. No ex post facto

violation occurs where legislation "creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment." Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995). Similarly, we think that the possibility of the AOC establishing a new supervised release program was too speculative and attenuated at the time that the appellees committed their offenses. Beyond that speculation, Law 49 remained perfectly consistent with the punishment assigned by law when the act to be punished occurred -- that is, a sentence not subject to the application of the ESP. Here, as in Morales, it "[can]not be said with any certainty that the amended statutory scheme was more 'onerous' than at the time of the crime." Lynce, 519 U.S. at 446 n.16 (citing Morales, 514 U.S. at 509-10).

The Puerto Rico Supreme Court held that the law applied here is no more onerous than the law in effect at the time of conviction, and we believe that the preceding analysis provides more than enough reason to reject the González-Fuentes petitioners' ex post facto claim under the deferential scrutiny of AEDPA review. Moreover, because we would reach this conclusion even on de novo review, our analysis applies with equal force to the Rivera-Feliciano plaintiffs. The district court erred in finding an ex post facto violation against either group.

E.

-25-

The Due Process Clause of the Fourteenth Amendment, which prohibits a state from depriving any person of "life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, has both a substantive and a procedural component. DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005). The district court held that Puerto Rico's actions violated both substantive and procedural due process. It first concluded that the reimprisonment itself violated substantive due process because it was an unconstitutionally arbitrary deprivation of liberty. Next, it determined that the process that Puerto Rico afforded the González-Fuentes petitioners when rearresting and reimprisoning them fell short of what they were constitutionally due. Each of these conclusions provided the court an independent basis for both its grant of habeas relief to the petitioners as well as its preliminary injunction to the Rivera-Feliciano plaintiffs.

1.

"The substantive component of due process protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Souza v. Pina, 53 F.3d 423, 425–26 (1st Cir. 1995) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). Thus, unlike a procedural due process claim, this challenge requires us to assess the constitutionality of the deprivation itself.

"[T]he criteria used for identifying government action proscribed by the constitutional guarantee of substantive due process vary depending on whether the challenged action is legislative or executive in nature." DePoutot, 424 F.3d at 118. Where, as here, it is an executive action that is challenged, the threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).[13]

---

[13]Even executive action that does shock the conscience will still not infringe substantive due process unless it also deprives an individual of a "protected interest in life, liberty, or property." See Aguilar v. U.S. Immigration & Customs Enf., 510 F.3d 1, 23 (1st Cir. 2007). Though we hold below that a liberty interest in ESP status is protected by procedural due process, it does not automatically follow that the same interest will be protected by its substantive sibling. Substantive due process protects only those interests that implicate one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21, (1997) (internal quotation marks and citations omitted). As a result, "[t]he interests protected by substantive due process are of course much narrower than those protected by procedural due process." Bell v. Ohio State Univ., 351 F.3d 240, 249-50 (6th Cir. 2003). Courts must be careful not to "inject the more demanding 'fundamental rights and liberties' analysis from the substantive due process sphere into the 'liberty interest' analysis that pertains to the procedural due process inquiry," Brown v. Cooke, No. 09-1144, 2010 WL 227574, at *2 (10th Cir. Jan. 22, 2010), and vice versa.

Here, because we determine that the challenged executive action is not conscience-shocking, it is unnecessary for us to determine whether ESP participants possess a liberty interest so fundamental as to be protected by substantive due process.

-27-

The "shock the conscience" test has been labeled "admittedly imprecise," Hawkins v. Freeman, 195 F.3d 732, 741 (4th Cir. 1999) (en banc), "virtually standardless," Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992), "somewhat amorphous," Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 53 (1st Cir. 2006), and "laden with subjective assessments," Lewis, 523 U.S. at 857 (Kennedy, J., concurring). Descriptions of what actions qualify as "conscience-shocking" often descend into a morass of adjectives that are as nebulous as they are pejorative, including "truly irrational," Golden ex rel. Balch v. Anders, 324 F.3d 650, 652 (8th Cir. 2003), "extreme and egregious," DePoutot, 424 F.3d at 118, "truly outrageous, uncivilized, and intolerable," Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999), and "stunning." Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Meanwhile, actions that have not been found to shock the conscience have still been described as "despicable and wrongful." Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991). It would seem that, at least at the margins, the shock-the-conscience test requires us to split the hairs of opprobrium.

Nevertheless, courts have made some inroads toward a more concrete doctrine over the years. It is well established that "negligence, without more, is simply insufficient to meet the conscience-shocking standard," J.R. v. Gloria, 593 F.3d 73, 80 (1st Cir. 2010), while "inten[t] to injure in some way unjustifiable by

-28-

any government interest" is likely sufficient.  Id. at 79. Anything between those two poles is "a matter for closer calls." Lewis, 523 U.S. at 849.  A hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with "violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (ellipses in original)).

Of course, what may be conscience-shocking conduct in one situation may not be in another, as "the analysis will vary with the subject matter and the circumstances." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006); see also Coyne v. Cronin, 386 F.3d 280, 288 (1st Cir. 2004) ("The conscience-shocking standard is not a monolith; its rigorousness varies from context to context."); Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 623 (1st Cir. 2000) ("[E]ach determination of whether state conduct 'shocks the conscience' is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred.").  For example, in situations "where government officials must act in haste, under pressure, and without an opportunity for reflection, even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically

-29-

for the very purpose of causing harm." Coyne, 386 F.3d at 288. On the other hand, in situations "where actual deliberation on the part of a governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity" by exercising "deliberate indifference." Id.

It is this deliberate indifference standard that the appellees rely on.[14] Both sets of appellees make a bold claim, asserting that reimprisonment would in itself constitute a reckless disregard for their loss of liberty, irrespective of how the AOC might choose to execute its objective. The González-Fuentes petitioners supplement this claim with an additional, narrower one. They posit that we should find deliberate indifference not only in the decision to reimprison, but also in the methods through which the AOC actually went about implementing that decision.

We begin with the version of the argument that is advanced by both sets of appellees. The ESP participants held a significant interest in the finality of their relaxed custodial status. Prior to this litigation, all of the appellees had spent multiple years (some as many as five) living in their homes rather than behind prison walls, and they had no reason to doubt that that

---

[14]The appellees do not argue that the Commonwealth acted with malice or with the purpose to oppress, nor did the district court make such a finding. Since the Commonwealth's decision to reincarcerate the appellees was the product of sustained reflection rather than urgency, we address the appellees' argument assuming, but without deciding, that they could prevail through a showing of deliberate indifference alone.

arrangement would be permanent so long as they abided by the terms of the program.  It took a decade for the Commonwealth to change its mind on the ex post facto implications of Law 49, but once it did so, it moved swiftly and in apparent disregard of the lives that appellees had begun to build for themselves.  It can scarcely be denied that all of the appellees were blindsided by the new administration's about-face on Law 49's retroactivity.

Against this backdrop, the appellees argue that substantive due process should protect roots running so deep against sudden uprooting.  It shocks the conscience, they argue, that "scores of people will have to live out the personal tragedy of [sic], after accomplishing what the state wanted them to -- rehabilitation -- they should have to leave behind their homes, families, jobs, churches, to be imprisoned for many more years, all for no particular reason of importance."  Appellees' Br. at 53-54.

The impact of reincarceration on the appellees is, of course, substantial.  By waiting until 2005, the Commonwealth did more than squash a mere expectation of liberty.  It set about actually undoing the liberty itself. See Morrissey v. Brewer, 408 U.S. 471, 482 n.8 (1972) ("It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom.") (quoting United States ex rel. Bey v. Conn. Bd. of Parole, 443 F.2d

1079, 1086 (2d Cir. 1971)). As Judge Friendly put it, "there is a human difference between losing what one has and not getting what one wants." Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1297, 1296 (1975). Because "due process must impose some outer limit on the power to revise sentences upward after the fact," Dewitt v. Ventetoulo, 6 F.3d 32, 34 (1st Cir. 1993), that human difference weighs into the shock-the-conscience analysis. See Lerner v. Gill, 751 F.2d 450, 459 (1st Cir. 1985) ("Only in rare circumstances have courts allowed the misconstructions of officials to estop the proper execution of state or federal law, and such cases have involved prejudice and harm beyond frustrated expectations.").

Nevertheless, we do not agree that the Commonwealth's actions rise to the level of a substantive due process violation. The appellees are mistaken in their assertion that the Commonwealth acted for "no particular reason of importance." The Commonwealth's executive branch necessarily has a fundamental interest in fidelity to legislative directives. The determination that the Ex Post Facto Clause would not implicate the retroactive application of Law 49 transformed the appellees' ESP participation into a clear violation of the AOC's enabling act. The Commonwealth had and has

a justifiable interest in correcting that violation, even if it once believed that no violation had occurred.[15]

The appellees labor to convince us that a violation of the statute as currently interpreted is irrelevant so long as their participation in the supervision program was lawful at the time it was granted. Yet while this lawful-at-the-time theory may in some circumstances validate the appellees' own interest in their liberty, as we explain below in our discussion of procedural due process, we do not agree that it somehow invalidates the government's countervailing interest in faithful application of the law. The proper question from the government's perspective is what is lawful <u>now</u>, no matter what was considered lawful at the time.

---

[15]We do not mean to propose a per se rule that the state's interest in enforcing its laws is always dispositive. Were such a rule in force, an individual's lawfully obtained interest in X at one point could easily be eviscerated any time the government changes its position about the lawfulness of X at some later point. <u>Cf.</u> <u>Heckler</u> v. <u>Cmty. Health Servs.</u>, 467 U.S. 51, 60-61 (1984) ("Though the arguments the Government advances [in enforcing the law] are substantial, we are hesitant . . . to say that there are no cases in which the public interest in . . . enforc[ing] the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government."). But while exceptional cases may exist in which some invidious government animus is afoot, this is not one of them. There is nothing in the record here to indicate that the Commonwealth's change in position was prompted by bad faith or evil purpose. On the contrary, the change seems to have been supported by clear justifications: a societal interest in condign punishment for persons convicted of murder; a legislative judgment that electronic release of these convicts was posing severe security concerns; and a belief, now vindicated, that the lower courts misjudged how the regulation interfaced with the Constitution.

Just because the appellees' liberty interest was valid ab initio does not somehow divest the Commonwealth of its legitimate stake in the correct application of the law as it is currently understood. And as that law is currently understood, it is illegal for the appellees to <u>retain</u> their ESP status, even if it was legal for them to have acquired it in the first place. Morever, as the Fourth Circuit explained under analogous circumstances in <u>Hawkins</u> v. <u>Freeman</u>, the Commonwealth possesses an interest in avoiding "the precedential risk of acquiescing in irregular enforcement of state law." 195 F.3d at 746.[16]

The Commonwealth's interest in correcting error is central to the shock-the-conscience analysis. In <u>Lewis</u>, the Supreme Court explained that the executive actions most likely to shock the conscience are those that are "intended to injure in some way unjustifiable by any government interest." 523 U.S. at 849. Even when the government is held to the less demanding deliberate indifference standard, we think the presence of interests on both sides of the scale reduces the likelihood of unconstitutionality. The Supreme Court's hypothetical archetype for a successful deliberate indifference claim is an individual taken into state

---

[16]The appellees correctly point out that the petitioner in <u>Hawkins</u> secured his liberty through a more run-of-the-mill administrative error, rather than through a deliberate legal interpretation that had been affirmed in the judiciary. But this distinction would not diminish the precedential risk of allowing the appellees to reap what has now become a facially unlawful benefit of an abrogated understanding of the Constitution.

custody who is then denied basic human needs such as food and medical care. Id. at 850-51. In that scenario, the government's deliberate indifference to an individual whom it has forced to become its ward shocks the conscience precisely because there is no legitimate interest in ignoring the ward's needs. "[T]he State's responsibility to attend to the medical needs of prisoners [or detainees] does not ordinarily clash with other equally important governmental responsibilities." Id. at 851-52 (first alteration added) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

We think this point is implicit in our earlier decision in DeWitt v. Ventetoulo. In DeWitt, which the appellees rely on here, we found a due process violation in the reimprisonment of a Rhode Island parolee who had already been at liberty for several months despite the fact that his parole had been granted in violation of state law. Explaining that "what is true for the usual case is often not true in the extreme case," 6 F.3d at 34, we conducted a fact-intensive inquiry before concluding that the petitioner's reimprisonment would extend beyond the constitutional pale. We were careful to explain, however, that our holding was justified not only by "the defendant's interest in finality," but also by the apparent absence of any "state[] interest in correcting error." Id. at 35. Rhode Island officials had first learned of the error through an ostensible parole violation, but did not seek to revoke the parole because it would have come with the cost of a

revocation hearing. Instead, the state sought to bypass such procedural protections entirely by claiming that the parole was never lawfully granted in the first place. Though others had also been released pursuant to the same mistake of law, Rhode Island never undertook "any wide-scale program to identify and resentence th[em]." Id. We therefore stressed that the parolee

> appears to have been singled out primarily to relieve the state of the trouble of conducting a parole revocation hearing. The impression is hard to avoid that the resentencing here primarily serves only to skirt the minimal due process obligations that attach to parole revocations, that the state could conduct such a proceeding at minimal cost, and that the state's own self-proclaimed interest in vindicating [the law in question] is limited to this case.

Id. at 35–36.

In this case, by contrast, there is no doubt as to the thoroughness of Puerto Rico's plans to reimprison every individual participating in the ESP in violation of Law 49. Puerto Rico is engaging in precisely the sort of wide-scale efforts that we emphasized were lacking in DeWitt. We conclude that given the circumstances here, the government has advanced a legitimate interest to justify its actions. The decision to reimprison the appellees following their time participating in the ESP does not in itself shock the conscience and therefore does not infringe substantive due process.

The González-Fuentes petitioners, having already been reimprisoned without any mention of Law 49, advance a more nuanced argument. They claim that the circumstances of their arrest and reimprisonment demonstrate that the Commonwealth's purported interest in vindicating Law 49 is mere pretext. They begin with the fact that the AOC initially found them to be ineligible for the ESP not because of their status as murder convicts, but because they each had more than three years left to serve the minimum of their respective sentences, contravening the 1999 regulation's three-years provision. Whether the 1999 regulation ever even applied to the petitioners is still contested, but the petitioners were reincarcerated only on the assumption that it did. Even that justification, the petitioners point out, developed during a fruitless investigation into allegations of bribery. Based on all these events, the petitioners theorize that after the bribery investigation yielded no evidence of foul play, the Commonwealth engaged in a series of insincere, post-hoc rationalizations for what at bottom was only an effort to take a tough-on-crime stance.

The district court agreed with the petitioners' theory. It found evidence not only in the fact that Law 49 was not mentioned until long after the arrests and reimprisonments, but also in the Commonwealth's commission of several procedural violations while executing those arrests and reimprisonments. In particular, the court noted: the initial decision to reincarcerate

the appellees was made by a low ranking technician who was not actually familiar with ESP regulations; ESP officials were never informed of the intention to arrest the appellees, let alone consulted regarding the decision; the arrest orders contained photocopied signatures of an individual who had not officially authorized its use; various procedural due process protections were never afforded; and finally, when asked during an evidentiary hearing, no high-ranking AOC personnel could recall how any of these decisions were actually made. The sum total of all these factors evinced what the district court found to be an "apathy and disdain" for the petitioners' plight accompanied by no legitimate governmental interest.

We take no issue with the district court's rebuke of the Commonwealth for cavalierly disregarding the petitioners' dignity. Nevertheless, we still cannot say that this disregard rises to the level of a substantive due process violation. To begin with, the petitioners do not allege that the Commonwealth conjured up its initial justification merely for the purpose of reimprisoning them. The most they have ever argued is that the justification was incorrect because the entire 1999 regulation, including its three-years provision, never actually applied to them. Given that the 1999 regulation was nominally in force when the appellees were released into the ESP, the Commonwealth's reasonable confusion over which regulation applied is not shocking, let alone conscience-

shocking.[17]  Thus, even though the Commonwealth did not invoke Law

49 until the state habeas stage, its interest has remained the same

throughout: adhering to its own laws.  The only thing that shifted

was the law in question.  That shift does not lessen the legitimacy

of the interest.

As for the flaws that the district court catalogued, all

of them concerned matters of procedure -- how, rather than why, the

Commonwealth pursued its objective.  Those flaws may give rise to

claims based on procedural due process, but we have difficulty

accepting the notion that they also add up to a substantive due

process claim when viewed in the aggregate.  Like its shift from

the three-years provision to Law 49's exclusion of murder convicts,

the Commonwealth's violations of procedural protocol do not negate

its substantive interests.

The shock-the-conscience test is an extremely demanding

one, and challenges analyzed under it rarely succeed.  See Matthew

D. Umhofer, Confusing Pursuits:  Sacramento v. Lewis and the Future

---

[17]Indeed, had the Commonwealth continued to press the three-
years provision as a basis for reimprisonment, it would have had at
least a colorable argument.  The petitioners claimed that Puerto
Rico's official policy was to apply the 1994 regulation to them
wholesale, without reference to subsequent regulations.  Yet the
record could also support the inference that this policy was never
meant to prevent all further regulatory developments, but only
those developments that would divest murder convicts of their
eligibility for the program.  If this reading is right, then the
AOC was correct in its attempt to apply the 1999 regulation's
three-years provision.  Right or wrong, however, the AOC's initial
reliance on the 1999 regulation was far from frivolous.

of Substantive Due Process in the Executive Setting, 41 Santa Clara L. Rev. 437, 475-76 (2001) (noting infrequency of successful challenges). The appellees' claim here meets the same fate as most of its peers. We are ultimately bound by the fact that substantive due process is not "a font of tort law," Lewis, 523 U.S. at 847 n.8, and limits executive action only when that action "was infected or driven by something much worse -- more blameworthy -- than mere negligence, or lack of proper compassion, or sense of fairness, or than might invoke common law principles of estoppel or fair criminal procedure to hold the state to its error." Hawkins, 195 F.3d at 746. Because that condition has not been met for either set of appellees, their substantive due process claim must fail.[18]

---

[18]As with the ex post facto claim, our de novo analysis of the questions governed by § 1983 ineluctably resolves the questions governed by AEDPA. We acknowledge, however, that the Puerto Rico Supreme Court rejected the González-Fuentes petitioners' habeas claim for a somewhat different reason than we do here. Unlike us, that court concluded that the petitioners held no protectable liberty interest, and that retracting an erroneously granted benefit would not shock the conscience. This discrepancy in reasoning notwithstanding, our agreement as to the ultimate disposition nevertheless means that the Puerto Rico Supreme Court's decision was not an unreasonable application of clearly established Federal law. See Clements v. Clarke, 592 F.3d 45, 55-56 (1st Cir. 2010) (noting that, in an AEDPA context, "[i]t is the result to which we owe deference, not the opinion expounding it."); Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) ("The ultimate question on habeas . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable.").

Moreover, the U.S. Supreme Court "has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this

2.

The district court also concluded that the manner in which Puerto Rico reimprisoned the appellees violated their right to procedural due process.  "We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (internal citation omitted).  On appeal, Puerto Rico focuses exclusively on the first of these steps, arguing that the appellees do not possess a constitutionally protected liberty interest in the first place. It offers two reasons in support:  first, the ESP is merely an alternative mode of, rather than liberty from, confinement; second, even if the ESP does create a protected interest as a general matter, it still could not have created one for these petitioners in particular because they had been admitted into the program erroneously.  We take up each claim in turn.

i.

Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (internal quotation marks omitted).  Thus, because the Supreme Court's "cases give no clear answer to the question presented, . . . 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.'  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." Wright v. Van Patten, 552 U.S. 120, 125–26 (2008) (per curiam) (internal citation omitted).

Although "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7 (1979), an individual already enjoying certain forms of conditional release has a protected liberty interest in retaining them. In Morrissey v. Brewer, the Supreme Court held that the Due Process Clause creates a liberty interest in parole. The Court listed a series of reasons why a parolee's liberty is unlike the minimal liberties of those who reside behind prison walls:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. . . . Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. . . . The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.

408 U.S. at 482. Similarly, in Young v. Harper, 520 U.S. 143 (1997), the Court determined that the petitioner held a liberty interest in his participation in a "pre-parole" program. Analogizing the program to the traditional parole that received due process protection in Morrissey, the Court noted that "[the petitioner] kept his own residence; he sought, obtained, and

maintained a job; and he lived a life generally free of the incidents of imprisonment." Id. at 148.

At the same time, however, "[t]he Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison." Meachum v. Fano, 427 U.S. 215, 224 (1976). On that basis, the Court held in Sandin v. Conner, 515 U.S. 472 (1995), that an inmate does not possess a protected liberty interest in preventing an intra-prison transfer to a more restrictive form of confinement unless the change would work an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. Applying that standard, the Court went on to hold that placement in thirty days' segregated confinement did not in itself implicate due process concerns. Id. at 485-86.

How the Due Process Clause should apply to the liberty interests of prisoners serving sentences in alternative forms of confinement remains an open question after Sandin. Courts have resolved the issue "by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by Morrissey." Holcomb v. Lykens, 337 F.3d 217, 221 (2d Cir. 2003).[19] We are thus required to locate the ESP along a

_____

[19]The facts of Holcomb demonstrate that the court did not intend the term "conditional release" to be limited to transitional programs designed to prepare inmates for full release. Holcomb involved an extended furlough program that, as defined in a state directive, is "an approved absence [for 15 or more consecutive days

-43-

spectrum of liberty that extends from the "ordinary incidences of prison life" at its lowest end to parole at its highest.

This warrants a closer look at the lives that the appellees were permitted to lead while participating in the program.  As with all participants in the ESP, they were serving out the remainder of their respective prison sentences in their homes, where they were free to live with others.  At the time of their reincarceration, the González-Fuentes petitioners were living with either close relatives, significant others, or spouses, and in many cases with children.  The current living arrangements of the Rivera-Feliciano plaintiffs are similar.  All of the appellees were generally required to remain at home, but had been authorized to leave in order to work a job or attend university.  They had to submit to a routine list of restrictions on alcohol consumption and substance abuse.  Finally, to ensure compliance, the appellees were made to wear an unremovable, waterproof electronic tracking anklet at all times.

This arrangement is not far from that of the parolee in Morrissey.  It is true that by having to gain the AOC's approval before they could leave the house, the appellees were confined in a way that parolees typically are not.  Yet after having secured approval for work release, their lives were similar in practice.

_____

and nights] from a correctional facility under precise conditions and is an extension of the limit of confinement of an offender." 337 F.3d at 218 n.1.

They woke up in their homes.  They went to work.  They returned to their homes.  On Sundays, some even attended church in their local communities.  In short, the appellees here had the liberty to "be gainfully employed" and "be with family and friends and to form the other enduring attachments of normal life."  Morrissey, 408 U.S. at 482.  And they expected all of this to continue so long as they remained on good behavior.[20]

Puerto Rico argues that our judgment here is constrained by our decision in Dominique v. Weld, 73 F.3d 1156 (1st Cir. 1996).  In Dominique, decided shortly after Sandin but before Young, we held that an institutionally confined inmate has no protected interest in participating in a work-release program.  Dominique, 73

_____

[20]The Seventh Circuit recently speculated in dicta that home detention might be constitutionally distinguishable from parole so long as a participant is serving out the balance of a sentence.  In Domka v. Portage County, 523 F.3d 776 (7th Cir. 2008), it acknowledged, without accepting, the argument that "revoking probation and returning [a home detainee] who already served his sentence to incarceration . . . is arguably a greater loss of freedom than having [a home detainee] serve out his remaining time of confinement in a different location."  Id. at 781 (internal quotation marks omitted).  Even though the appellees here are still serving out their sentences, we are not prepared to describe their experience of lost freedom as insufficient to merit procedural due process protection.  Like parolees, the appellees justifiably relied "on at least an implicit promise that [participation in the program] will be revoked only if [they] fail[] to live up to the [program] conditions."  Young, 520 U.S. at 147-48 (quoting Morrissey, 408 U.S. at 482).  And like parolees, they experienced a tremendous loss of freedom when that promise was broken.  In light of the significant liberties that the appellees enjoyed along with the government's word that good behavior alone would extend those liberties into the future, we decline to adopt Domka's dicta here.

-45-

F.3d at 1160. Focusing on the fact that the challenged confinement was itself normal prison life, we explained that "confinement within four walls of the type plaintiff now endures is an 'ordinary incident of prison life.' It is not 'atypical.'" Id. Any difference between the challenged confinement and the work-release program was ultimately irrelevant.

At the outset, we note that Dominique's approach has limits. In that case, we focused exclusively on the question of whether the challenged confinement to which the inmate was returned constituted an ordinary incident of prison life. That analysis was narrower than the one the Supreme Court subsequently employed in Young, which also considered the nature of the program from which the inmate had been removed. It may very well be that a consideration of the work-release program at issue in Dominique would compel the conclusion that the petitioner there held no protected liberty interest. But if Sandin requires us to train our eyes solely on the comparison between the challenged confinement and the ordinary incidences of prison life, without any consideration of the freedoms inherent in the outside-of-prison arrangement that is being revoked, then it would seem that a parolee would hold no liberty interest, either. In light of Young, which found a conditional release program so similar to parole as to merit due process protection, that conclusion cannot possibly be correct. Indeed, Sandin itself relied on Morrissey, the very

-46-

touchstone for a parolee's due process rights.  See 515 U.S. at 480.  For this reason, some have criticized our analysis in Dominique as being overly broad and inconsistent with Supreme Court precedent.  See Anderson v. Recore, 317 F.3d 194, 200-01 (2d Cir. 2003); see also McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002) ("It is clear from the Court's framing of the problem in Sandin . . . that Sandin's holding was limited to internal prison disciplinary regulations."); Orellana v. Kyle, 65 F.3d 29, 32 (5th Cir. 1995) (holding that Sandin does not overrule prior law concerning the creation of liberty interests with respect to parole decisions).

When we attempted to interpret Sandin in our Dominique opinion, we did not yet have the benefit of Young, which was handed down the following year.  We now think that Young clarifies Sandin's holding.  See Kim v. Hurston, 182 F.3d 113, 118 (2d Cir. 1999) (acknowledging the historical difficulty of applying Sandin to work-release cases and then noting that Young had subsequently "shed considerable light on the issue").  It implicitly suggests that the due process analysis depends on whether the baseline liberty being deprived is that of the general prison population or rather of a more parole-like arrangement.  When the challenged action concerns what can be fairly described as the transfer of an individual from one imprisonment to another, Sandin's "atypical hardship" standard remains our lodestar; when, on the other hand,

-47-

it concerns the disqualification of an individual from a supervised release program that begins to more closely resemble parole, Young and Morrissey will form part of the guiding constellation. The upshot is that in cases in which an individual is not incarcerated in prison, the extent of his existing liberty within the relevant program -- and not just the extent of his reduced liberty in a challenged placement -- must be taken into account.

This is not to question Dominique's ultimate holding, as the case before us is distinguishable on at least one critical fact. The transitional work-release program in Dominique required the plaintiff to reside in a correctional facility. See 73 F.3d at 1157. Unlike him, ESP participants reside, indefinitely, in their homes.

Other circuits have emphasized the significance of the difference between confinement in an institutional setting and confinement within the home. In Asquith v. Department of Corrections, 186 F.3d 407 (3d Cir. 1999), the Third Circuit rejected a plaintiff's analogy between his halfway-house program and the pre-parole program at issue in Young due to the fact that he "never left institutional confinement." Id. at 411. "In Young," the court emphasized, "the pre-parolee lived in his own home. . . . These restrictions [of the halfway house] are dispositive because they amount to institutional confinement." Id. Similarly, in Kim, the Second Circuit held that the ability to reside in one's home while

working a job rendered a work-release program "virtually indistinguishable from either traditional parole or the Oklahoma program considered in Young." 182 F.3d at 118. Finally, in Paige v. Hudson, 341 F.3d 642 (7th Cir. 2003), the Seventh Circuit observed that "[t]he difference between being confined in a jail and being confined to one's home is much greater than the difference between being a member of the general prison population and an inmate of a prison's segregation wing, the sort of difference that Sandin refused to characterize as the difference between having liberty and being deprived of it." Id. at 643-44; see also Graham, 922 F.2d at 381 (criticizing another court's description of a home furlough as "merely chang[ing] the location where the prisoner's sentence is to be served," because "home is a less restrictive place in which to serve one's sentence as well as a different one"). Taken together, these statements suggest that the Due Process Clause is particularly protective of individuals participating in non-institutional forms of confinement. A halfway house may indeed be a house, but it is not a home.

It is true that the electronic monitoring severely curtailed the privacy that the appellees would traditionally enjoy in their homes. Yet if confinement within the home did not redound to their privacy, it still redounded to their liberty. The ESP, unlike institutional confinement of any kind, allowed the appellees to live with their loved ones, form relationships with neighbors,

lay down roots in their community, and reside in a dwelling of their own choosing (albeit subject to certain limitations) rather than in a cell designated by the government. Even without creating an expectation of privacy, what the ESP afforded the appellees was included in the constitutionally protected prerogative to "establish a home." Meyer v. Nebraska, 262 U.S. 390, 399 (1923); see also Cabrol v. Town of Youngsville, 106 F.3d 101, 107 (5th Cir. 1997) (referring to the Due Process Clause's protection of "an individual's freedom . . . to establish a home and position in one's community"); Margaret Jane Radin, Property for Personhood, 34 Stan. L. Rev. 957, 992 (1982) ("The home is affirmatively part of oneself . . . and not just the agreed-on locale for protection from outside interference.").

For these reasons, we believe that the appellees' arrangement was sufficiently similar to traditional parole -- far more like parole than the work release program in Dominique -- to merit protection under the Due Process Clause.

## ii.

Even accepting that participation in the ESP could theoretically form the basis for a protected liberty interest, Puerto Rico contends that the appellees' procedural due process claim should still fail because they never lawfully acquired that interest in the first place. The argument's logic proceeds in five steps: (1) the appellees were only able to receive their ESP

privileges because lower courts had held that the Ex Post Facto Clause would bar the retrospective application of Law 49 to individuals who committed offenses earlier than May 26, 1995; (2) subsequently, however, that interpretation was rejected by the Puerto Rico Supreme Court on collateral review (a ruling that, as we explained above, we do not disturb here); (3) once the constitutional impediment had been removed, Law 49 required retrospective application; (4) retrospective application would render the original grant of ESP privileges to the appellees void ab initio; (5) therefore, that grant cannot confer any protected interest under the Due Process Clause.

In support of this argument, Puerto Rico points to a line of Commonwealth cases establishing that, as far as the Due Process Clause is concerned, an "unlawful" grant of liberty is no grant of liberty at all. This may be another version of the Puerto Rico Supreme Court's position that "administrative errors" are not capable of creating liberty interests. There is some federal precedent for this proposition, though none of it has been invoked at any point in this litigation. See Jenkins v. Currier, 514 F.3d 1030, 1035 (10th Cir. 2008); Henderson v. Simms, 223 F.3d 267, 274-75 (4th Cir. 2000); Campbell v. Williamson, 783 F. Supp. 1161, 1164 (C.D. Ill. 1992). We need take no position on the matter, however, because applying the theory here would be misplaced either way. There was no administrative error involved in the AOC's

reasoned interpretation of the Ex Post Facto Clause; this was not the proverbial stray checkmark in the wrong box. Nor was there anything unlawful about it at the time. On the contrary, pursuant to the judgments of lower courts, the AOC was prohibited from applying Law 49 retrospectively against the inmates who had been parties in those cases.[21] It would presumably have been collaterally estopped from applying the law retrospectively to other inmates, as well. The AOC was thus not only permitted to refrain but <u>bound</u> to refrain from applying Law 49 to those who committed offenses before the statute's effective date, and consequently to consider the merits of appellees' suitability for the ESP.[22] Up until 2005, when the Puerto Rico Supreme Court determined on habeas review that the Ex Post Facto Clause did not bar retroactive application of Law 49, the decision to grant the appellees ESP privileges was perfectly consistent with the law.

Taking all of this into account, the true question presented is not whether the appellees can develop a liberty interest in the fruits of an unlawful agency action, but whether the appellees can develop a liberty interest in the fruits of an agency

---

[21]One of these parties, according to the record, is also a party to the habeas petition here.

[22]Not surprisingly, this is exactly how the AOC behaved. Its administrator circulated an internal memorandum in 1996 indicating that retroactive application would risk contempt of court. That same year, the Commonwealth conceded before a state appeals court that Law 49 applied prospectively and therefore may only be applied to persons who committed offenses on or after its effective date.

action that is lawful at the time but whose legal basis is undermined in a subsequent and unrelated proceeding. Neither side offers any case law to answer this question.[23]

        Based on our own review of the issue, we are not prepared to say that an otherwise protected liberty interest granted pursuant to a final judgment with preclusive effect can somehow be rendered invisible to the Due Process Clause through a subsequent proceeding. As the Supreme Court once observed, "[t]he past cannot always be erased by a new judicial declaration." Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374 (1940).[24]  And as past

---

[23]The one federal case that the Commonwealth cites in its appellate brief, Kaufmann v. Puerto Rico Telephone Co., 841 F.2d 1169 (1st Cir. 1988), dealt with the development of constitutional property interests, rather than liberty interests. Kaufmann looked to the laws of Puerto Rico because "[s]uch property rights are not created by the constitution . . . but by 'existing rules or understandings that stem from an independent source such as state law.'" Id. at 1173 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985)).  The petitioners' liberty interest in this case differs dramatically in that it derives directly from the Constitution, regardless of what state law provides. See Dominique, 73 F.3d at 1158 n.4 (observing that under Morrissey, the Constitution, rather than state law, gives rise to the liberty interest in parole).
        The appellees, for their part, offer no case law whatsoever.

[24]Chicot dealt with a court's retroactive application of a new rule to transactions predating that rule's adoption, an issue that has spawned a great deal of subsequent doctrinal evolution and academic commentary. See Kermit Roosevelt III, A Little Theory Is a Dangerous Thing: The Myth of Adjudicative Retroactivity, 31 Conn. L. Rev. 1075 (1999).  The issue we address here is far more limited and far less familiar -- not whether a new rule is to be applied to prior transactions, but whether a liberty interest that accrues under the old rule is to be honored under the new one. On this narrower question, we believe Chicot's reasoning to be pertinent.

events go, liberty interests arising under the Constitution should be especially difficult to whitewash.

A conclusion on collateral review that lower courts should never have imposed a particular ex post facto limitation on Law 49 does not alter the fact that they did impose a particular ex post facto limitation on Law 49. Because that limitation was never challenged (let alone overturned) on direct appeal, the appellees in this action were able to acquire a grant of liberty stamped with the imprimatur of the Commonwealth judiciary. That fact bears not only on the appellees' justifiable reliance, but also on the validity ab initio of the grant itself. See Littlefield v. Caton, 679 F. Supp. 90, 92 (D. Me. 1988) (finding a protected liberty interest in good-time credits awarded under a statute later found to be unlawful), aff'd, 856 F.2d 344 (1st Cir. 1988); see also Rooker v. Fidelity Trust Co., 263 U.S. 413, 415 (1923) ("If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding."); Teague v. Lane, 489 U.S. 288, 308-09 (1989) (citing Rooker and Chicot for the proposition that "it has long been established that a final civil judgment entered under a given rule of law may withstand subsequent judicial change in that rule"). To be sure, we are not suggesting that the appellees have (and the appellees are not claiming to have) a free-standing right to the continuing application of the now-abrogated lower court

judgments themselves; the Puerto Rico Supreme Court had the exclusive discretion whether to apply its own holding retroactively to the parties before it. See Littlefield, 856 F.2d at 347. But the existence of those lower court judgments, even if abrogated, strikes us as an excellent example of what the Court referred to in Chicot as "an operative fact" that "may have consequences which cannot justly be ignored." Chicot, 308 U.S. at 374. We conclude that a protected liberty interest accruing under a final judgment is not void ab initio and may therefore serve as the basis for a due process challenge.

### iii.

"Once it is determined that due process applies, the question remains what process is due." Morrissey, 408 U.S. at 481. On appeal, the Commonwealth has made no attempt to argue that the minimal procedures it has offered to those already reincarcerated (that is, the González-Fuentes petitioners) would withstand constitutional scrutiny once a protected liberty interest is found. Nor would such an attempt be availing. ESP participants may of course be justifiably reimprisoned, but, like parolees, they are constitutionally entitled to written notice of the justification before a hearing takes place. See id. at 486–87; Wolff, 418 U.S. at 563–64. Yet the petitioners here were not given any explanation until the hearing itself. By failing to give the petitioners any pre-hearing information as to why their ESP status was being

revoked, Puerto Rico deprived them of "a chance to marshal the facts in [their] defense and to clarify what the charges are, in fact." Wolff, 418 U.S. at 564. Although Puerto Rico's justification turned on questions of law rather than fact, the petitioners were handicapped in their ability to mount a defense all the same.[25]

Indeed, Puerto Rico violated the petitioners' right to advance notice on two separate occasions: first at the agency level, when the purported justification for reimprisonment was the 1999 regulation, and then again in the state habeas proceedings, when the justification suddenly changed to Law 49. We agree with the Second Circuit that "[w]hen procedural due process requires an explanation of the ground for termination of a liberty interest, it requires a statement of the actual ground, and if an initial ground is changed, the person deprived of liberty is entitled to know the new ground." Kim, 182 F.3d at 119.

Also problematic was the fact that the petitioners had to wait two weeks after their arrest before receiving any opportunity to contest the revocation. In Morrissey, the Supreme Court stated that an arrested parolee is entitled to a preliminary inquiry "as promptly as convenient after arrest while information is fresh and

---

[25]We note that because this situation presents legal, rather than factual, questions, the pre-deprivation process limned in Morrissey, 408 U.S. at 485-88, is not of talismanic significance here. While the process that is due should be guided by Morrissey in principle, it must be tailored to the peculiar exigencies of the situation at hand.

sources are available" in order to establish reasonable grounds for detention pending a final hearing. 408 U.S. at 485. We see no reason why the same rule should not apply to ESP participants. According to the district court, the AOC's internal operating procedures required a preliminary hearing no more than 72 hours from arrest and a final hearing no more than five business days later. Had the Commonwealth followed those rules, the length of delay might have been constitutionally adequate. But for reasons that Puerto Rico has never made clear, it did not follow those rules in this case. The two-week delay, absent any reasonable explanation, infringes due process under the standard laid down in Morrissey.

The appellees are therefore correct in claiming that Puerto Rico violated (in the case of the petitioners)[26] and is threatening to violate (in the case of the plaintiffs) their right to procedural due process.

iv.

Yet establishing that rights were or are likely to be violated does not necessarily entitle the appellees to the particular remedies that they seek. If an adequate hearing and pre-

---

[26]In the González-Fuentes petitioners' habeas challenge, the parties dispute whether the procedural due process claim was fairly presented to the Puerto Rico Supreme Court and, if so, whether that court adjudicated the matter on the merits, triggering the heightened deference owed under AEDPA. We need not decide these threshold questions, however, because we ultimately conclude that any procedural due process violations that occurred would still not warrant habeas relief.

deprivation notice could still serve some relevant fact-finding purpose, the González-Fuentes petitioners might very well deserve readmission into the ESP pending a procedurally sufficient revocation process, and the Rivera-Feliciano plaintiffs might equally well deserve an injunction that would ensure such sufficient process remains the rule. But the procedures that should have been provided all along would do the appellees little good now. Puerto Rico's current justification for the deprivation of their liberty rests on a pure question of law: whether retroactive application of Law 49 withstands ex post facto and substantive due process challenges. Once we acknowledge, as we do today, that the answer to this question is yes, there is nothing left for the appellees to challenge -- no matter what further procedures we might order.[27] They certainly would not be entitled to another forum in which to rehash their failed legal challenge to Law 49; on that issue, these proceedings have already given them all the process that they were due. And so long as Law 49 remains applicable to them, there is no dispute on any issue, factual or legal, that could plausibly secure them their liberty.

---

[27]It is true that, theoretically, any of the appellees might still be able to contest the accuracy of his identification, the nature of the offense of conviction, and the length of his sentence. But the notion that any of them might have had such a basic defense all along seems fanciful when none has made the argument over the course of five years of litigation.

"[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute . . . which has some significant bearing" on the underlying deprivation. Codd v. Velger, 429 U.S. 624, 627 (1977) (per curiam). As Justice Breyer explained in Sandin:

> [W]hether or not a particular procedural element normally seems appropriate to a certain kind of proceeding, the Due Process Clause does not require process unless, in the individual case, there is a relevant factual dispute between the parties. Just as courts do not hold hearings when there is no "genuine" and "material" issue of fact in dispute between the parties, see Fed. Rule Civ. Proc. 56 (summary judgment), so the Due Process Clause does not entitle an inmate to additional disciplinary hearing procedure . . . unless there is a factual dispute (relevant to guilt) that the additional procedure might help to resolve.

Sandin, 515 U.S. at 503-04 (Breyer, J., dissenting); see also Anderson v. Recore, 446 F.3d 324, 330-32 (2d Cir. 2006) (Sotomayor, J.) (holding that, given uncontested facts in a prison disciplinary matter, a hearing is only necessary to the extent that the adjudicator maintains discretion over the ultimate outcome). Because we hold that Law 49 provides a valid, independent basis for the deprivation of liberty, leaving the appellees with no argument that a constitutionally sufficient procedure might vindicate, we conclude that any procedural due process violations do not justify the respective remedies that the two sets of appellees have requested. Habeas relief for those already reimprisoned and

preliminary injunctive relief for those yet to be reimprisoned would be equally nugatory.[28]

As a postscript, we emphasize that this conclusion derives from concerns over remedies rather than over rights. Our decision does not preclude the appellees from seeking some other form of relief, such as monetary damages. "[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." Carey v. Piphus, 435 U.S. 247, 266 (1978). This means that courts should take, in the Tenth Circuit's formulation, "an ex ante perspective on the right to due process hearings." Rector v. City & County of Denver, 348 F.3d 935, 944 (10th Cir. 2003). At the time of the deprivation, the petitioners vigorously contested (and the plaintiffs, had they not immediately sought provisional relief, would have contested) the applicability of both of Puerto Rico's legal bases, first the 1999 regulation and then Law 49. Thus, to paraphrase Rector, "while ex post, their loss on the merits precluded any claim for [habeas corpus or injunctive relief], the denial of the opportunity to sway

---

[28]One loose end deserves to be flagged. The record reveals that at least one of the plaintiffs in this action, Mendelson Ortiz-Nicolau, was a party to one of the prior suits in the Puerto Rico courts. As a result of that suit, he obtained a permanent injunction that would prevent the AOC from ever reincarcerating him based on his murder conviction. See Ortiz-Nicolau v. Corr. Admin., No. KPE99-2586 (P.R. 1a Inst. Nov. 8, 1999). If Puerto Rico should now attempt to reincarcerate him along with the other plaintiffs, special consideration as to the res judicata effect of that injunction could be warranted.

[prison] officials towards their cause" constituted an injury. Id.;
see also Kim, 182 F.3d at 113 (finding that even though "the minimal
hearing that procedural due process requires would have done [the
plaintiff] little good," officials remained liable for damages
because "the procedural due process requirement of a statement of
reasons must be observed").[29]

### III.

For the reasons described above, we reverse the district
court's grant of habeas corpus to the González-Fuentes petitioners
and annul the writ. We also vacate the district court's preliminary
injunction and remand the case to the district court for proceedings
consistent with this opinion. Each side shall bear its own costs.

---

[29]Of course, Puerto Rico may still volunteer to provide the
appellees with the hearing that they should have received from the
start. But doing so now, after the initial violations and purely
as a result of this litigation, would not shield it from any
monetary liability that might otherwise apply.